76 F.3d 1498
 70 Fair Empl.Prac.Cas. (BNA) 247,
67 Empl. Prac. Dec. P 43,940,
43 Fed. R. Evid. Serv. 1022
Mary CORNEVEAUX, Plaintiff-Appellant and Cross-Appellee,
v.
CUNA MUTUAL INSURANCE GROUP, Defendant-Appellee and Cross-Appellant.
 Nos. 94-4167, 94-4174.
 United States Court of Appeals,
Tenth Circuit.
 Feb. 21, 1996.
 
 Erik Strindberg (Ralph E. Chamness, with him on the briefs) of Cohne, Rappaport & Segal, P.C., Salt Lake City, Utah, for Plaintiff-Appellant and Cross-Appellee.
 J. Michael Hansen (Claudia F. Berry, with him on the brief) of Suitter Axland & Hanson, Salt Lake City, Utah, for Defendant-Appellee and Cross-Appellant.
 Before MOORE, BRORBY and KELLY, Circuit Judges.
 BRORBY, Circuit Judge.
 
 
 1
 Mary Corneveaux brought suit against CUNA Mutual Insurance Society (hereinafter "CUNA") alleging age discrimination and retaliation under 29 U.S.C. § 623(a) and (d) and § 626, sexual and religious discrimination under 42 U.S.C. § 2000e-2(a) and breach of an implied contract under Utah law. After a five-day trial, the district judge granted CUNA's Motion for Judgment as a Matter of Law on all claims. Ms. Corneveaux appeals on five issues, claiming: 1) the trial court erred by granting CUNA's Motion for Judgment As a Matter of Law as to Ms. Corneveaux's age discrimination claim; 2) the trial court abused its discretion by refusing to allow certain expert testimony; 3) the trial court erred by granting CUNA's Motion for Judgment as a Matter of Law on the implied-in-fact contract claim; 4) the trial court erred by refusing to allow the jury to decide Ms. Corneveaux's age retaliation claim; and 5) the trial court erred in determining Ms. Corneveaux's Title VII claims were frivolous and groundless and thereby awarding attorney's fees and costs to CUNA. CUNA cross-appeals alleging the district court erred in awarding CUNA only $5,000 in attorney's fees when "the undisputed evidence showed that it had expended $125,172.23 in fees and costs" and that the district court erred in awarding attorney's fees against Ms. Corneveaux's counsel under 42 U.S.C. § 2000e-5(k) rather than under an alternative theory of liability. We exercise jurisdiction pursuant to 28 U.S.C. § 1291.
 
 
 2
 Ms. Corneveaux was employed by CUNA for thirteen years. She was hired as a claims trainee, became a claims adjuster and then was promoted to a branch claims manager. In 1985 her position as branch claims manager was eliminated and she was made a resident claims adjuster. In 1989, due to company-wide downsizing, CUNA phased out Ms. Corneveaux's position as a resident adjuster. In response to the company-wide downsizing, CUNA's president, Richard Heins, circulated a letter stating displaced employees "should have preference" for new jobs within the company and retraining would be provided. Ms. Corneveaux applied for a company opening to be a service specialist. She was given a cursory interview with Nile Peterson, a group sales manager who was responsible for hiring, and two tests to rate her personality and aptitude. Mr. Peterson hired Jonathan Nichols, a man under age forty who had not been previously employed by the company, for the position. Ms. Corneveaux did not obtain other employment with CUNA.
 
 
 3
 * Ms. Corneveaux first contends the district court erred in granting CUNA judgment as a matter of law on her age discrimination claim. Judgement as a matter of law is appropriate "[i]f during a jury trial a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed.R.Civ.P. 50(a). We review de novo a grant or denial of a judgment as a matter of law. Sheets v. Salt Lake County, 45 F.3d 1383, 1387 (10th Cir.), cert. denied, --- U.S. ----, 116 S.Ct. 74, 133 L.Ed.2d 34 (1995). " '[W]e must construe the evidence and inferences most favorably to the nonmoving party.' " F.D.I.C. v. United Pacific Ins. Co., 20 F.3d 1070, 1079 (10th Cir.1994) (quoting Ralston Dev. Corp. v. United States, 937 F.2d 510, 512 (10th Cir.1991)).
 
 
 4
 The district court granted CUNA judgment as a matter of law after Ms. Corneveaux had rested her case. The court held Ms. Corneveaux did not make a prima facie case for age discrimination, that she had not produced "sufficient evidence from which a reasonable jury could conclude that the defendant discriminated against her on the basis of her age," and "that the evidence the other way is overwhelming." The Age Discrimination in Employment Act states:
 
 
 5
 It shall be unlawful for an employer--
 
 
 6
 (1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age.
 
 
 7
 29 U.S.C. § 623(a). To establish a prima facie case of age discrimination the plaintiff must show by a preponderance of the evidence: 1) she was within the protected age group; 2) she was qualified for the position for which she applied; 3) she was adversely affected by an employment decision of the defendant; and 4) a younger person was hired. See Cone v. Longmont United Hosp. Ass'n, 14 F.3d 526, 529 (10th Cir.1994).
 
 
 8
 At trial Ms. Corneveaux introduced evidence sufficient to allow a reasonable jury to find she established a prima facie case of age discrimination. Ms. Corneveaux satisfied the first prong by showing she was over age forty when she applied for the position. 29 U.S.C. § 631(a); Thomas v. International Business Machines, 48 F.3d 478, 485 (10th Cir.1995). She addressed the second prong by showing she met the listed qualifications for the job and was capable of being trained to meet any unwritten qualifications. She met the third prong by showing she was not hired for the position and as a result was forced to look for alternative employment. Finally, she met the fourth prong by showing the position was filled by a younger person.
 
 
 9
 Once Ms. Corneveaux established a prima facie case, the burden shifted to CUNA to produce evidence of a facially nondiscriminatory reason for its employment decision. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03, 93 S.Ct. 1817, 1824-25, 36 L.Ed.2d 668 (1973); see Bolton v. Scrivner, Inc., 36 F.3d 939, 944 (10th Cir.1994) ("ADEA claims are analyzed under the three-step framework outlined in McDonnell Douglas."), cert. denied, --- U.S. ----, 115 S.Ct. 1104, 130 L.Ed.2d 1071 (1995). If CUNA met its burden of production, Ms. Corneveaux's burden of persuasion then required that she show either age was a determinative factor in the employment decision or CUNA's explanations for its action were merely pretexts. Cone, 14 F.3d at 526. A showing of either one of these elements will permit a jury to find "the defendant discriminated on the illegal basis of age." Id.
 
 
 10
 CUNA offered five nondiscriminatory reasons why it did not hire Ms. Corneveaux for the position.[1] She challenged each one. First, CUNA alleged Ms. Corneveaux had been involved in several personality conflicts with different people throughout the years, which made others not want to work with her. For the most part, these minor incidents were reported on a second-hand basis and ranged from Ms. Corneveaux snapping at a secretary for forwarding a call to yelling at an employee because someone turned off the lights in the women's restroom while she was in it. None of the incidents had resulted in a verbal or written reprimand to Ms. Corneveaux. Mr. Peterson expressed a particular concern that Ms. Corneveaux would be unable to work with Don Bleazard, "the current manager of a very large credit union," because of an alleged confrontation between Ms. Corneveaux and Don Bleazard, several years earlier. Interestingly enough, Mr. Bleazard testified he did not remember the alleged incident and had not had any particular problems with Ms. Corneveaux. To further rebut these allegations, Ms. Corneveaux called several coworkers as witnesses, both those she supervised and those who supervised her, who all testified she was highly professional and pleasant to work with. She also produced copies of her performance evaluations, which were very complimentary.
 
 
 11
 Second, CUNA claimed Ms. Corneveaux was not qualified for the position because she did not possess sales experience or a sales license. In response, Ms. Corneveaux introduced evidence that she was never told she needed a sales license; the job description did not list a sales license as a requirement; it was not a company-wide policy to require a sales license for the position; Mr. Peterson had hired someone as a service specialist six months earlier who did not have a sales license; and the beginning of the job provided for a training period during which time she could have studied for and obtained a license. She also introduced evidence that although she did not have sales experience per se, she had a great deal more experience in the insurance industry than the person hired for the position, that the position itself did not involve sales, and that she had sales-related experience prior to her tenure at CUNA she was never given an opportunity to discuss.
 
 
 12
 Third, CUNA also claimed Ms. Corneveaux's scores on two personality profile and aptitude tests indicated she was "not the best person for the job." In response, Ms. Corneveaux demonstrated she received higher scores on these tests than any other applicant and, in any event, a similarly situated employee had not been required to take the tests before being transferred to a new position within the company. Also, she showed the test results described her as easy to train. Furthermore, Ms. Corneveaux attempted to introduce expert testimony challenging the validity and application of the test results. The district court ruled this testimony was inadmissible. Ms. Corneveaux challenges this finding separately, and we will address her argument shortly.
 
 
 13
 Fourth, CUNA stated the fact Ms. Corneveaux would have gone from a position where she was earning $36,000 per year to one with a salary range of $19,000 to $30,000 per year was almost a "knockout factor." CUNA claimed she was unwilling to accept a salary reduction of more than $2,000. Ms. Corneveaux testified, however, that she told Mr. Peterson while she would like to keep her current salary she was "willing to negotiate." She also introduced evidence that other employees who had been transferred to lower paying positions had been allowed to keep their current salaries. Finally, CUNA argued that even if Ms. Corneveaux had been able to keep her current salary this would have caused morale problems because she would have been making more money than others who had been service specialists for several years. Ms. Corneveaux responded by showing that salary levels within CUNA were confidential and that even if her higher salary had been discovered it could have been explained by stating that she was a transfer rather than a new hire.
 
 
 14
 For each reason CUNA gave for not hiring Ms. Corneveaux, she introduced contradictory evidence from which a reasonable jury could conclude CUNA's explanations were pretextual. It was a matter of whether the jury believed Ms. Corneveaux or CUNA's representatives. In a jury trial, the judge "should refrain from weighing conflicting evidence, evaluating the credibility of witnesses, or substituting its judgment for that of the jury." Cockrell v. Boise Cascade Corp., 781 F.2d 173, 177 (10th Cir.1986). This case presented material factual disputes which should have been resolved by the trier of fact. If the jury had found CUNA's reasons to be pretexts for age discrimination then it could have inferred intentional discrimination and found in favor of Ms. Corneveaux. St. Mary's Honor Center v. Hicks, 509 U.S. 502, ----, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993).
 
 
 15
 In addition to showing CUNA's explanations could be pretextual, Ms. Corneveaux introduced evidence that her age was a determinative factor in CUNA's employment decision. See Cone, 14 F.3d at 529. In an age discrimination case plaintiffs "need not disprove defendant's reasons or demonstrate that age was the only factor motivating the decision, but they 'must show that age actually played a role in the [employer's] decision making process and had a determinative influence' on the decision." Jones v. Unisys Corp., 54 F.3d 624, 632 (10th Cir.1995) (quoting Rea v. Martin Marietta Corp., 29 F.3d 1450, 1455 (10th Cir.1994)). Although it was disputed whether Mr. Peterson asked Ms. Corneveaux her age or if she volunteered it, it was undisputed that he wrote down her age, and other job applicants' ages, sometimes underlining, circling or calculating ages on the applicants' resumes or other relevant documents. While Mr. Peterson denied considering an applicant's age in hiring decisions, he did admit to underlining and circling things he thought were "important" or "relevant" about an applicant. His credibility should have been left to the jury to determine. A reasonable jury could have concluded Mr. Peterson's notations and calculations evidenced that age played a determinative role in the hiring process.
 
 
 16
 Because we find Ms. Corneveaux introduced legally sufficient factual evidence from which a reasonable jury could find intentional age discrimination, we reverse and remand for trial on her age discrimination claim.
 
 II
 
 17
 Ms. Corneveaux next contends the district court abused its discretion by refusing to allow two of her expert witnesses to testify. "[T]he district court has broad discretion in determining whether or not to admit expert testimony, and we review a decision to admit or deny such testimony only for abuse of discretion." Orth v. Emerson Elec. Co., 980 F.2d 632, 637 (10th Cir.1992). Testimony by an expert is admissible "[i]f scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702. In United States v. Rice, 52 F.3d 843, 847 (10th Cir.1995), we noted the advisory committee notes to Fed.R.Evid. 702 explain that:
 
 
 18
 Whether the situation is a proper one for the use of expert testimony is to be determined on the basis of assisting the trier. "There is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute."
 
 
 19
 The district court ruled that proffered testimony by two of Ms. Corneveaux's experts was "not even close to being relevant" under Fed.R.Evid. 402. The court alternatively asserted the evidence was inadmissible under Fed.R.Evid. 403 because its probative value was "substantially outweighed by the danger of confusion of the issues or misleading to the jury, or considerations of undue delay, waste of time."
 
 
 20
 Ms. Corneveaux first attempted to introduce the testimony of Dr. Susan Sheridan, an expert in educational and value testing. Dr. Sheridan's testimony would have focused on the Wonderlic and Hartman Value Profile tests Mr. Peterson administered to Ms. Corneveaux and the other job applicants. In particular, according to Ms. Corneveaux's proffer of testimony, Dr. Sheridan would have testified that "there was no difference between Mary Corneveaux's test score on the Wonderlic and Jonathan Nichols' test score for purposes of those tests and that they were identical scores." Dr. Sheridan also would have addressed the validity of the tests and how Mr. Peterson improperly used the tests "to confirm his preexisting notions about Ms. Corneveaux." This testimony was highly relevant to show whether CUNA's claim they hired Mr. Nichols instead of Ms. Corneveaux because her score was too high on the Wonderlic test was pretextual. Evaluating CUNA's Wonderlic and Hartman Value Profile tests fell beyond the common experience of the jury. As long as Dr. Sheridan's testimony was limited to the applicable issues, its probative value would far outweigh any danger of confusing or misleading the jury as well as any concerns of delay or waste of time. This kind of value/aptitude testing is a science, and it is the paradigmatic role of experts to help juries understand the application of science. The district court abused its discretion in not allowing Dr. Sheridan to assist the jury in interpreting the test scores.
 
 
 21
 The second expert witness Ms. Corneveaux attempted to introduce was Dr. Robert Croyle, a professor of psychology at the University of Utah. Dr. Croyle's testimony was to focus on how Mr. Peterson's bias against older workers manifested itself in his behavior. Dr. Croyle was going to explain what Mr. Peterson's notations of age and reliance on second-hand reports indicated about his decision making process. The question is not whether we would have allowed Dr. Croyle's testimony, but whether the district court acted outside the zone of permissibility. In this case, the jury had before it evidence that Mr. Peterson had written down applicants' ages, calculated applicants' ages, and circled, highlighted and underlined applicants' ages. The jury also had Mr. Peterson's own testimony that he highlighted, wrote down and circled information he believed to be important or relevant. Although we find the helpfulness of Dr. Croyle's testimony in interpreting this evidence to be a close call, we do not find the district court abused its discretion in excluding Dr. Croyle's testimony.
 
 III
 
 22
 Next, Ms. Corneveaux argues the district court improperly granted CUNA judgment as a matter of law on her implied-in-fact contract claim. Ms. Corneveaux maintains that two letters written by CUNA President Richard Heins established an implied-in-fact contract that displaced employees "would have preference for available jobs and would receive retraining if necessary." The first letter is addressed to all CUNA employees and in it Mr. Heins explains CUNA's plans to downsize and specifically states:
 
 
 23
 We have carefully considered the impact on the Madison-based employees of the Division. Despite the changes, the job forecast for Madison indicates that there will be four times more opportunities at CUNA than individuals affected by these changes. This creates an excellent opportunity for those whose jobs will change.
 
 
 24
 Experienced employees should have preference for jobs as they become available in our organization. I have given our Human Resources Department a directive to establish the necessary retraining courses as soon as possible to carry out this process. To help people who are available for reassignment, a pool concept will be used which is aimed at assisting in this transition. The key elements of the program will be discussed with the Union and with the involved employee group. The program will also be explained to all employees. We intend to work together.
 
 
 25
 The second letter was a response to a letter Ms. Corneveaux had written expressing her concern about not being hired for the service specialist position. It stated in pertinent part:
 
 
 26
 Your situation deserves, and is getting, specific and individual attention. I have asked Bill Stevenson, our Vice President of Human Resources, to follow up with the appropriate management staff to determine what else needs to be done to ensure our meeting our commitment to you. Please be assured that I and the entire CUNA Mutual management team understand the seriousness of the disruption caused by these changes. We are anxious, as I am sure you are, to see as many people as possible get reestablished quickly.
 
 
 27
 She contends the above language represents a contract which CUNA breached by not hiring or retraining her for the position of service specialist.
 
 
 28
 The district court held the above language did not bind the employer to do anything. We apply state law to interpret contractual obligations. See Madsen v. Prudential Fed. Sav. & Loan Ass'n, 635 F.2d 797, 802 (10th Cir.1980), cert. denied, 451 U.S. 1018, 101 S.Ct. 3007, 69 L.Ed.2d 389 (1981). In Utah, the existence of an implied-in-fact contract is generally a question for the jury, however, "if the evidence presented is such that no reasonable jury could conclude that the parties agreed to limit the employer's right to terminate the employee, it is appropriate for a court to decide the issue as a matter of law." Johnson v. Morton Thiokol, Inc., 818 P.2d 997, 1001 (Utah 1991). In order to establish an implied-in-fact contract under Utah law,
 
 
 29
 [t]here must be a manifestation of the employer's intent that is communicated to the employee and sufficiently definite to operate as a contract provision. Furthermore, the manifestation of the employer's intent must be of such a nature that the employee can reasonably believe that the employer is making an offer of employment other than employment at will.
 
 
 30
 Id. at 1002. In Utah, an employer's written policies, bulletins or handbooks may be considered evidence of an implied-in-fact contract. Brehany v. Nordstrom, Inc., 812 P.2d 49, 54 (Utah 1991).
 
 
 31
 Both parties correctly note that Utah presumes employment contracts are at will absent an express period of duration. Hodgson v. Bunzl Utah, Inc., 844 P.2d 331, 333 (Utah 1992). Ms. Corneveaux bore the burden of establishing the implied-in-fact contractual agreement. Johnson, 818 P.2d at 1001. In this case, however, Ms. Corneveaux cannot argue successfully that the above letters rebut the presumption of at-will employment. There is no dispute that CUNA had the right to terminate her for any reason. Rather, she argues the above language was a contract to give her preference over non-CUNA employees for company positions and to retrain her. Ms. Corneveaux is mistaken. First, the letters themselves show it was unreasonable for her to believe such expressions constituted a contractual obligation. Notably, the first letter, although addressed to all employees, specifically refers to Madison-based and union-member employees regarding its intentions of retraining and relocating. Ms. Corneveaux was a nonunion employee based in Salt Lake City. Furthermore, the second letter adds the intention "to see as many people as possible get reestablished quickly." Clearly, this phrasing indicates that not every displaced employee would be reestablished.
 
 
 32
 Second, in construing the terms of the letters to see if it was reasonable for Ms. Corneveaux to believe they established an implied-in-fact contract it is necessary to consider the circumstances as a whole. Hodgson, 844 P.2d at 334. Thus, we note that at the same time Ms. Corneveaux was receiving these letters she was also receiving information about her severance package. The fact she was being told the terms and conditions of her termination make it unreasonable for her to believe that the company had guaranteed her another position within the company.
 
 
 33
 Overall, the letters are not, as a matter of law, definite enough to establish a contractual right. In Ingels v. Thiokol Corp., 42 F.3d 616, 623-24 (10th Cir.1994), we applied Utah law and found language in an affirmative action policy stating "all things being equal, it would retain employees with more seniority, experience, and skill" was not "sufficiently definite to act as a contract." Here, Mr. Heins simply states that displaced employees "should" be given preference. He does not guarantee every displaced employee a new position. "[G]eneral assurances of an ongoing working relationship are not sufficiently definite so as to rebut the at-will presumption." Evans v. GTE Health Sys. Inc., 857 P.2d 974, 977 (Utah Ct.App.1993), aff'd., 878 P.2d 1153 (Utah 1994). Mr. Heins' words of encouragement appear to be the expression of a policy to try to help the displaced workers, but such policy does not rise to the level of a contractual obligation. The district court's dismissal of plaintiff's claim for breach of an implied contract is affirmed.
 
 IV
 
 34
 Ms. Corneveaux also appeals the district court's granting judgment as a matter of law on her retaliation claim under 29 U.S.C. § 623(d). As part of its severance package CUNA agreed to provide terminated employees with job counseling "through a local out-placement agency until a new job is obtained--provided that the maximum cost to CUNA Mutual will not exceed $7,000 per employee." When Ms. Corneveaux learned others in the company had been allowed to use the $7,000 to purchase company equipment, she requested permission to use the money towards purchasing the company car she had been driving. Her supervisor directed her to write a letter outlining her request, which she did. In response to her letter she was asked to undergo an outplacement assessment by a guidance counselor, which she also did. During this time Ms. Corneveaux filed a discrimination charge with the Utah Antidiscrimination Division alleging discriminatory treatment by CUNA. At this point she was told she had to sign a form releasing any claims against CUNA before she could receive the $7,000. She refused to do so and was never paid the $7,000.
 
 
 35
 The district court held "there is no credible evidence for concluding that she was denied that $7,000 severance benefit because she filed the discrimination claim. She was treated precisely the same as the other employees in the company." We review the district court's decision de novo. See Sheets v. Salt Lake County, 45 F.3d 1383, 1387 (10th Cir.), cert. denied, --- U.S. ----, 116 S.Ct. 74, 133 L.Ed.2d 34 (1995). In order to establish a prima facie case of retaliation under the Age Discrimination in Employment Act, Ms. Corneveaux needed to show: "(1) protected opposition to discrimination or participation in a proceeding arising out of discrimination; (2) adverse action by the employer contemporaneously or subsequent to the employee's protected activity; and (3) a causal connection between such activity and the employer's action." Anderson v. Phillips Petroleum Co., 861 F.2d 631, 634 (10th Cir.1988).
 
 
 36
 Ms. Corneveaux clearly met the first step. By filing a charge of discrimination with the state of Utah she was engaging in a proceeding arising out of discrimination. She met the second step by showing that shortly after she filed the charge against CUNA it required her to go through several hoops in order to obtain her severance benefits. The third step is where she fell short. A causal connection is established where the plaintiff presents "evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action." Anderson, 861 F.2d at 634; see Archuleta v. Colorado Dept. of Insts., 936 F.2d 483, 486 (10th Cir.1991). During the trial, Don Davidson, who was assistant vice president of human resource development at the time of her termination, testified that it was CUNA's normal practice to have an employee sign a settlement agreement due to the "extraordinary nature" of redirecting the funds. Ms. Corneveaux called Arnold Garduno, a former employee of CUNA who had been allowed to use the $7,000 to purchase a company car, as a witness. Mr. Garduno testified that although CUNA asked him to undergo the out-placement assessment he did not do so because of a scheduling conflict. He further testified he was required to sign a release of any claims against CUNA before he was paid the $7,000. Ms. Corneveaux did not rebut CUNA's evidence that it required completion of a form waiving all claims against CUNA from all employees prior to disbursing the $7,000. We agree with the district judge that there was no evidence establishing a causal connection between her protected actions and the company's refusal to pay her the $7,000. The district court's judgment as a matter of law is affirmed as to Ms. Corneveaux's retaliation claim.
 
 V
 
 37
 Finally we turn to Ms. Corneveaux's claim that the district court abused its discretion in granting attorney fees and costs to CUNA. Due to the similarity of the issues, we will simultaneously address CUNA's cross-appeal in which CUNA alleges the district court erred in only awarding CUNA $5,000 for attorney's fees and that the district court should have awarded fees under the court's inherent power or under Fed.R.Civ.P. 11 rather than under 42 U.S.C. § 2000e-5(k). In its Findings of Fact and Conclusions of Law the district court stated:
 
 
 38
 Based on the unreasonable and groundless nature of plaintiff's Title VII claims, the Court hereby orders plaintiff's counsel to pay defendant the sum of $5,000 for attorney's fees incurred by the defendant in defense of the Title VII (sex and religious discrimination) claims. See 42 U.S.C. § 2000e-5(k) (Supp.1994); Crabtree v. Muchmore, 904 F.2d 1475, 1477 (10th Cir.1990) (affirming award of attorney's fees against plaintiff's counsel for bringing unreasonable civil rights action).
 
 
 39
 Prior to its determination the district court had asked Ms. Corneveaux to prepare an affidavit demonstrating how much she could afford to pay. The district court, however, then assessed the award against Ms. Corneveaux's counsel, stating the court was satisfied Ms. Corneveaux did not have the ability to pay attorney's fees. When CUNA's counsel questioned the propriety of making the award against Ms. Corneveaux's counsel, suggesting the necessity of addressing Rule 11 violations, the district court stated it found Ms. Corneveaux's Title VII claims "unreasonable and groundless" but "I don't find a Rule 11 violation ... that has not been briefed or argued, and I don't find that this suit was vexatious or a violation of Rule 11. I don't find that it goes that far and I will not find.... And that is why my attorney's fees award is based solely on Title Seven." We review an award of attorney's fees for abuse of discretion. Figures v. Board of Pub. Util. of Kansas City, 967 F.2d 357, 362 (10th Cir.1992). However, "any statutory interpretation or other legal analysis which provides the basis for the award is reviewable de novo." Supre v. Ricketts, 792 F.2d 958, 961 (10th Cir.1986).
 
 
 40
 In a Title VII action or proceeding "the court, in its discretion, may allow the prevailing party ... a reasonable attorney's fee" as part of the costs. 42 U.S.C. § 2000e-5(k). The district court expressly relied on § 2000e-5(k) and our decision in Crabtree v. Muchmore, 904 F.2d 1475 (10th Cir.1990), as its authority for awarding attorney's fees against Ms. Corneveaux's counsel. Although an issue of first impression in this Circuit, we agree with both parties and our sister circuits that it is inappropriate to award attorney's fees against counsel in a Title VII action. In Roadway Express, Inc. v. Piper, 447 U.S. 752, 761, 100 S.Ct. 2455, 2461, 65 L.Ed.2d 488 (1980), the Court noted that "[n]either § 1988 nor § 2000e-5(k) makes any mention of attorney liability for costs and fees." We have held that "Congress intended that the 'standards for awarding attorney's fees [under § 1988] be generally the same as under the fee provisions of the 1964 Civil Rights Act.' " Cooper v. Singer, 719 F.2d 1496, 1499 n. 5 (10th Cir.1983) (en banc) (quoting S.Rep. No. 1011, 94th Cong., 2d Sess. 4, reprinted in 1976 U.S.C.A.N. 5908, 5912). In Roadway, the Court identified a Senate Report accompanying § 1988 as reinforcing "the view that the statute was not intended to permit recovery from opposing counsel." 447 U.S. at 761 n. 9, 100 S.Ct. at 2461 n. 9. See Quiroga v. Hasbro, Inc., 934 F.2d 497, 504 (3d Cir.) (recognizing Title VII "does not authorize assessment of fees against the loser's attorney"), cert. denied, 502 U.S. 940, 112 S.Ct. 376, 116 L.Ed.2d 327 (1991); Smith v. Detroit Fed'n of Teachers, Local 231, 829 F.2d 1370, 1374 n. 1 (6th Cir.1987) ("an award under section 1988 may only be charged against the losing party, not the party's attorney."); Hamer v. County of Lake, 819 F.2d 1362, 1370 (7th Cir.1987) ("[s]ection 1988 only authorizes the imposition of fees against parties to the litigation, not their attorneys."); Durrett v. Jenkins Brickyard, Inc., 678 F.2d 911, 915 (11th Cir.1982) (holding that § 2000e-5(k) "contemplates assessments of attorney's fees against losing parties, not against counsel"). Therefore, the district court clearly abused its discretion in awarding attorney's fees pursuant to 42 U.S.C. § 2000e-5(k) against Ms. Corneveaux's attorney.
 
 
 41
 We then turn to the other authority cited by the district court for its award. In Crabtree we remanded to have attorney's fees awarded pursuant to either 42 U.S.C. § 1988 or Fed.R.Civ.P. 11. Crabtree, 904 F.2d at 1479. The holding in Crabtree does not support the award of attorney's fees in this case. For although in Crabtree we directed the district court to determine the fault as between the attorney and the client, we referenced Chevron, U.S.A., Inc. v. Hand, 763 F.2d 1184, 1187 (10th Cir.1985), which addresses the proper allocation of Rule 11 sanctions between client and attorney. In this case, the district court had already held that Rule 11 sanctions were inappropriate. Therefore, at best, Crabtree lends support to the district court's intentions the fees be awarded pursuant to § 2000e-k(5), which as we noted above was an inappropriate ground for an award against Ms. Corneveaux's counsel. Therefore, we find that the district court abused its discretion in awarding attorney's fees. The award of attorney's fees is vacated.
 
 
 42
 We reject CUNA's request to remand to allow the district court to assess attorney's fees under its inherent powers or Rule 11. The district court expressly stated several times that Rule 11 sanctions were not warranted. Furthermore, the district court found the Title VII claims did not go so far as to be vexatious. See F.D. Rich Co. v. United States ex rel. Indus. Lumber Co., 417 U.S. 116, 129, 94 S.Ct. 2157, 2165, 40 L.Ed.2d 703 (1974) (holding that the inherent power of the court to award attorney's fees applies where the losing party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons"). The proceedings below make it clear the judge did not find the violations strong enough to merit an award of attorney's fees pursuant to Rule 11 or its inherent powers. We do not find this decision was an abuse of discretion.
 
 VI
 
 43
 For the reasons stated above we REVERSE and REMAND Ms. Corneveaux's age discrimination claim, with instructions that Dr. Sheridan be allowed to testify as an expert witness, and VACATE the award of attorney's fees. The district court's order is otherwise AFFIRMED.
 
 
 
 [1]
 We agree with Ms. Corneveaux that it is not clear whether these reasons pertain to her qualifications for the position or are meant to establish legitimate business reasons for not hiring her. We also agree that, regardless, each raises a contested material fact