Keren **HERTENSTEIN**, Plaintiff,

v.

**KIMBERLY HOME HEALTH CARE, INC.,** Defendant.

No. 98–2369–JTM.

United States District Court, D. Kansas.

July 12, 1999.

Sarah A. Brown, Sharon A. Coberly, Coberly & Brown, Overland Park, KS, for Plaintiff.

Carl A. Gallagher, Lawrence D. Greenbaum, Juliann Johnson, McAnany, Van Cleave & Phillips, Kansas City, KS, for Defendants.

## MEMORANDUM ORDER

MARTEN, District Judge.

Plaintiff Keren Hertenstein has brought the present action alleging sexual harassment and retaliation against her former employer, Kimberly Home Health Care, Inc. The defendant has moved for summary judgment. The court has reviewed the evidence and arguments submitted by the parties and finds, for the reasons stated herein, that the defendant's motion must be granted.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir.1988).

The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.,* 754 F.2d 884, 885 (10th Cir.1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.,* 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed. R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### Findings of Fact

The defendant Kimberly Home Health Care, Inc., is a corporation in the business of supplying home health services. Hertenstein was hired in October, 1996 as a records clerk, with her duties including filing notes into client charts and ordering supplies. In addition, on one or two occasions, Hertenstein also translated for Spanish speaking clients as part of her duties.[1]

Hertenstein's direct supervisor was Records Coordinator Linda Grewell. During Hertenstein's employment with Kimberly, two women held the top management positions at the facilities where she worked. Deb Stephens was the Branch Director until August, 1997, and Jackie Harvey took over the similar role of Director of Clinical Operations and Services in September of 1997. At all relevant times, the Branch Managers were Deb Stephens and Jackie Harvey.

Hertenstein's sister, Kamey Batiz, also worked as a records clerk for Kimberly, and was also supervised by Grewell.

Kimberly had a policy prohibiting sex harassment and published it in its employee handbook, a copy of which Hertenstein received. Hertenstein knew of the policy against harassment, and had read it several times.

David Estes was employed by Kimberly as a registered nurse. Estes was directly supervised by Jo Denton, a female. Estes was not Hertenstein's supervisor.

Hertenstein has testified that, in May of 1997, Estes told her it was "too bad you're married, that rules out a chance for me sleeping with you." (Hertenstein dep., at 32).[2]

---

**1.** Plaintiff's response asserts that translation was a regular part of Hertenstein's work duties and that she was on-call 24 hours a day to perform such services, citing the testimony of David Estes. But Estes was not Hertenstein's supervisor and had no direct knowledge of her responsibilities. Other evidence establishes that, prior to the time of the alleged retaliation, Hertenstein had only one translation assignment. It did not involve use of the pager.

**2.** Hertenstein's current statement is the only support for this version of Estes's statement. Hertenstein's sister, Kamey Batiz, testified that she remembered Estes stating that it was too bad Hertenstein was married, but did not recall that Estes said he wanted to sleep with her. Similarly, as noted above, in her subsequent complaint about the comment, Hertenstein only reported that Estes told her it was too bad she was married.

Hertenstein reported the comment, or, rather, a portion of it, to her supervisor, Deb Stephens. Hertenstein told Stephens that Estes had told her that it was "too bad you're married." Hertenstein's reporting of the comment was made in late May of 1997. Stephens spoke to Estes's supervisor. Estes subsequently approached Hertenstein, told her that someone had spoken to him, and apologized. Hertenstein told Branch Manager Deb Stephens that "Everything is fine—he's been in and I've had no problems with him." (Plf. Exh. O, Stephens Aff., at ¶ 7).[3]

Hertenstein never reported any other offensive conduct by Estes to Stephens. Plaintiff cites testimony by Batiz that Estes walked by her, smelled her perfume, and made "a comment." (Batiz dep. at 55). There is no evidence how close this walking by was, or what the "comment" was. It is uncontroverted that Hertenstein did not report or complain of this comment at the time.

Hertenstein next complained to Kimberly management in a letter dated September 16, 1997, to Jackie Harvey. According to the letter, Estes told Hertenstein that he had been dreaming about her all weekend. At least one other employee heard this comment. Hertenstein testified that another employee heard the comment and that she "got a little embarrassed" and left the room. (Hertenstein dep. at 93). The letter also reported that on September 11, Tom Nicholson, another Kimberly employee, reported that Estes had been "watching the show," in that he had been looking at the breasts of her sister, Batiz. (Hertenstein dep. at 94).

After this complaint, Estes was confronted with the complaint and received written counseling as part of the defendant's disciplinary process. Estes's supervisor, Jo Denton, explained the ramifications of inappropriate conduct, and explained that any continued behavior would be grounds for additional disciplinary action or termination. A written version of the events was placed in Estes's permanent disciplinary file.

After this counseling, Estes made no more comments, and Hertenstein had no more problems with him. According to her sworn EEOC charge, once she complained about Estes in September, "the sexual harassment stopped." (Def. Exh. 3, at 1000000012).

In her complaint submitted in the present action, Hertenstein alleges that she was subjected to sexual harassment by Tom Nicholson. However, Hertenstein did not report Nicholson's alleged harassment to the EEOC. She did report Nicholson's alleged harassment in a November 19, 1997 letter to Branch Manger Harvey. The letter reported there had been rumors that she had been having an affair with Nicholson. The letter also reported Nicholson told Hertenstein that "on a scale of 1–100 that his feelings for me were at 95% and that he wished for me to sleep with him at some point," that single red roses appeared in her mailbox on October 14, 17, 21, and 24, that Nicholson told her he had seen more roses in the mailbox but had removed them, and that there had been some "prank pages" from her to Nicholson and from Nicholson to her.

Harvey confronted Nicholson, who told her that he and Hertenstein were not having an affair, that he had not sent Hertenstein the roses, and that he had not told her he wanted to sleep with her or made the "scale of 1–100" comment.

Harvey did not decide between the versions of Nicholson and Hertenstein. No corroborating evidence existed to support Hertenstein's allegations. Other employees observed that Nicholson and Hertenstein appeared to be friends. Hertenstein herself has testified that she considered Nicholson her friend. Hertenstein has

---

**3.** Plaintiff's response suggests the reason Hertenstein did not have any complaints for several weeks after the May "too bad you're married" comment was that she was off work for several weeks due to an automobile accident. This is incorrect. Hertenstein was off work due to the April 2 accident until April 22.

conceded she does not know who sent her the roses.

While not deciding who was giving the correct version of events, Harvey explicitly warned Nicholson about doing anything Hertenstein might construe as a sexual advance. Hertenstein has not identified any harassing conduct by Nicholson after her complaint.

In her response to the motion for summary judgment, Hertenstein attempts to rationalize the failure to make any complaints of Nicholson's alleged behavior to an alleged failure to obtain effective relief in response to her complaints about Estes. However, as the uncontroverted facts demonstrate, when Hertenstein made her initial complaint about Estes in May, she received prompt and effective attention from the defendant. Estes ceased his behavior during the early summer, and Hertenstein told management that "Everything is fine—he's been in and I've had no problems with him." When, several months later, Estes again engaged in conduct which prompted a complaint from Hertenstein, Estes was subjected to counseling and discipline, and Hertenstein never had any subsequent problems with him.

In her November 19, 1997 letter to the EEOC, Hertenstein made no mention of allegedly harassing conduct by Nicholson. There is no mention of the "scale of 1–100" comment or any comments that Nicholson wanted to sleep with her. Instead, the letter portrays Nicholson as another victim—that he along with her was the subject of rumors that they were having an affair.

Hertenstein alleges that she was subjected to retaliation after she complained about Estes. In addition to her sister, Hertenstein told co-workers Christa Timbrook and Kelly Gouldsmith that she had complained about Estes.

Hertenstein alleges that, after she complained about Estes's conduct, the following events occurred: (1) a sticker supporting Estes appeared over his mailbox, stating "we are a family of 100,000," (2) rumors were spread about an affair between Hertenstein and Nicholson, (3) prank pages were sent to Hertenstein to call "Erotic City" and the "Gay and Lesbian Hotline," (4) co-workers began to treat her badly—male workers would not speak to her, Jackie Harvey did not ask her what she was doing for Thanksgiving, and persons in the data entry department talked about her behind her back,[4] (5) having her pager taken from her, (6) being counseled about wearing inappropriate attire, specifically wearing a short skirt or shorts, and (7) being told to stay out of the pharmacy.

In December of 1997, Hertenstein was counseled by Harvey for wearing a skirt which was too short. According to Hertenstein, she was not actually wearing a skirt, but shorts made so "[t]he back looked like shorts and the front looks like a skirt." (Hertenstein dep. at 71). The defendant's dress code does not specifically prohibit shorts or skirts under a certain length, but it does require "appropriate business attire." (Plf.Exh. K).

Finally, according to Hertenstein, after her complaint, her sister and Nicholson were the only workers who did not treat her differently. She has testified that the alleged retaliation by her co-workers "made me feel bad," but has also unequivocally testified that they did not interfere with her ability to do her job. (Hertenstein dep. at 103).

When Harvey learned about the prank pages, she asked Hertenstein to leave the pager with her temporarily to see if any more pages came in. In addition, Kimberly management attempted to contact the pager company to find records of the prank pages, but were unable to do so. Because Hertenstein had told her that she suspected that Christa Timbrook had sent the prank pages, Harvey directed Pat

---

4. According to Hertenstein, she learned about this by putting her ear to the door to see what they were talking about.

Howard to meet with Timbrook on the subject. Howard stated that Timbrook appeared "visibly shocked" by the allegation. (Harvey dep., at 111).

Subsequently, Hertenstein's pager was taken from her because of a need to reduce costs. At Harvey's direction, Patty Rooney, who oversaw the pagers, reviewed employees' pagers and made recommendations as to whose pagers were nonessential. Rooney determined that Hertenstein did not have to have a pager. The pagers of Hertenstein and another employee were taken away.

Hertenstein did not tell Harvey about the alleged retaliatory behavior or the rumors she was having an affair with Nicholson until her November 19, 1997 letter.

In 1997, Kimberly combined two of its offices into a single office in Lenexa, Kansas which included a pharmacy. All employees were told that only authorized employees were to enter the pharmacy area, and signs were posted to that effect. Without a policy restricting access to the pharmacy area, Kimberly could lose its accreditation.

Hertenstein resigned her position with Kimberly effective December 8, 1997.

Hertenstein first contacted the EEOC on or about November 21, 1997, when she completed an EEOC Intake Questionnaire. In her correspondence with the EEOC, Hertenstein reported the alleged harassment by Estes, and the alleged retaliation by her co-workers. Hertenstein consulted with her current attorney prior to signing the EEOC draft charge. The charge makes no mention of harassment by Nicholson.

Nicholson left the workplace in late November due to a death in his family. In her response, Hertenstein alleges that the prank pages and roses stopped after Nicholson left. In fact, the uncontroverted evidence establishes that these incidents tapered off and ceased several weeks before Nicholson left.

In her response, Hertenstein cites several additional incidents which she characterizes as harassment by Nicholson. According to her, Nicholson sent pages to Hertenstein with "4–5–8" as the message, which, he told her, means "I love you." (Hertenstein dep. at 51). He also would come into the records room to chat with her, and twice hugged her (by placing a hand on her shoulder). He told her that she had beautiful legs and feet. She also cites hearsay testimony (relayed by her sister Batiz) that Nicholson harassed an employee named Rose Schwyhart.

These facts were never reported to the defendant Kimberly or to the EEOC. Moreover, as to the "beautiful legs and feet" comment, Hertenstein in her deposition accused Estes, not Nicholson, of making this comment. (Hertenstein dep. at 109, lines 17—25).

Hertenstein also alleges that the defendant breached rules of confidentiality in the handling of her complaints about Estes and Nicholson. According to her, Christa Timbrook told Harvey about the EEOC charge in November shortly after it was filed. However, the evidence only indicates that information about Hertenstein's complaints was restricted to managers for purposes of investigating the complaints. The evidence also indicates that Hertenstein herself was the source of her co-workers' knowledge of the harassment complaints.

Hertenstein has failed to document any breaches of confidentiality by Kimberly management. Following the September complaint, Harvey consulted Patty Rooney, who had human resources experience, about who she should contact in the corporate office about the complaint. She did not discuss any of the details of the complaint. She also spoke with Jo Denton, Estes's manager, but the court cannot find this to be a breach of confidentiality—it was an integral part of the disciplinary process to speak to the alleged harasser's supervisor. In contrast, Hertenstein spoke with or in the presence of at least three co-workers about her complaints.

Hertenstein left Kimberly in December of 1997. According to her response, she became depressed and suicidal, and has been unable to work after these events. She has, however, apparently attended school since the fall of 1998. The plaintiff, however, has not identified any expert who will provide admissible testimony attributing her depression to the alleged harassment.

Hertenstein also alleges that Kimberly's managers had insufficient training in the company's sexual harassment policy. However, she also has conceded that she knew of the policy, and had in fact read it "[p]lenty of times." (Hertenstein dep. at 105). She also alleges that the return of the pager was not motivated by any desire to economize, and that this served as a pretext for retaliation. She stresses that Harvey and Rooney have different recollections about the list that was generated about unnecessary pagers. It remains uncontroverted, however, that Hertenstein never used her pager for business purposes, and that the removal of the pager, like the other alleged acts of "retaliation," did not interfere with her ability to do her job.

### Conclusions of Law

■ In the present action, Hertenstein has raised a claim of hostile work environment, sexual harassment, retaliation, and constructive discharge. In addition to attacking the merits of each of these claims, defendant Kimberly also argues that the action should be dismissed, to the extent it touches upon the alleged harassment by Nicholson, since Hertenstein made no express reference in her complaint to the EEOC or in the charging document that she was complaining about Nicholson's behavior. Rather, in those documents, she complained only about the conduct of Estes. The EEOC charge signed by Hertenstein and dated December 17, 1997 makes no mention of any alleged harassment by Nicholson. Hertenstein was explicitly asked in her deposition if she ever told anyone at the EEOC that Nicholson had made harassing statements to her, and

responded by stating "I wrote the letters I sent them.... Maybe he was in there." (Hertenstein dep. at 40).

■ The purpose behind the exhaustion rule is to allow the defendant and the EEOC the opportunity to investigate and conciliate. *Ingels v. Thiokol Corp.*, 42 F.3d 616, 625 (10th Cir.1994). Here, the court finds that this purpose was met. Even though there may have been no explicit reference in the formal complaint or charging document, it appears that Hertenstein did attach correspondence (which had been previously sent to Kimberly) which does include references to Nicholson's alleged behavior. Reading the evidence in the light most favorable to the plaintiff, the court finds that Kimberly's argument of failure to exhaust administrative remedies, while close, must be denied.

■ However, the court also finds that, as to the alleged hostile working environment, the uncontroverted facts establish that it was not so pervasive, extreme, or intimidating as to materially alter the conditions of her working environment or to constitute an actionable case of harassment.

Sexual harassment is actionable under a hostile work environment theory when the harassing conduct is "sufficiently severe or pervasive 'to alter the conditions [of the victim's] employment and create an abusive working environment.'" *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (*quoting Henson v. Dundee*, 682 F.2d 897, 904 (11th Cir.1982)). The conduct must be both objectively and subjectively abusive, and need not lead to a nervous breakdown before Title VII comes into play. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

The Supreme Court recognized that the standard for determining an actionable hostile work environment set forth in *Meritor* and reaffirmed in *Harris* is not and could not be "a mathematically

precise test." *Id.* at 22, 114 S.Ct. 367, 126 L.Ed.2d 295. The Court provided some guidance for applying the standard by articulating the following nonexhaustive list of factors relevant to the determination:

the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

*Id.* at 23, 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295. The Court further emphasized that in deciding this issue courts should "look[ ] at all the circumstances" and that "no single factor is required." *Id.*

*Lockard v. Pizza Hut,* 162 F.3d 1062, 1071–71 (10th Cir.1998).

Hertenstein has claimed that she was harassed by two co-workers, Estes and Nicholson. As to Estes, the evidence (read in the light most favorable to Hertenstein) is that in May of 1997, Estes told Hertenstein that it was too bad she was married since that ruled out his sleeping with her. Hertenstein complained about this comment, and, by her own admission, she had no further problem with Estes for the next four months. On September 17, Estes allegedly told Hertenstein that he had dreamed about her all weekend. He also told her at some point that she had nice legs. She now also alleges that Estes stared at her breasts.

Hertenstein did not consider the remark about her legs serious enough to mention it in her complaint to management. Moreover, although she does mention Estes "enjoying the show" in her complaint to management in September, she made the complaint only that Estes was engaging in this behavior as to her sister, Ms. Batiz. She made no complaint that Estes was engaging in similar behavior as to her. The limited impact of Estes's alleged conduct on the plaintiff herself is demonstrated in her deposition, where she admits that Estes "[c]ould have been [watching] me or her," (Hertenstein dep. at 94) and further

testified that she only knew about the alleged harassment after Tom Nicholson told her Estes was enjoying the show, and "I never thought anything about it until Tom mentioned it." (Id. at 95).

The failure of a plaintiff to mention alleged misbehavior in a complaint to management provides some indication she did not consider it greatly offensive. *Houck v. City of Prairie Village,* 977 F.Supp. 1128, 1136 (D.Kan.1997). Here, Estes never engaged in any threatening conduct towards Hertenstein. He did, without using graphic, obscene, or sexually explicit language, express on a limited number of occasions, an attraction towards the plaintiff. Hertenstein considered two of the comments inappropriate and reported them to management, one in June and one in September. Hertenstein explicitly stated that after her complaint in June she had no more problems with Estes. When she complained again in September, Estes was counseled and again Hertenstein stated that she had no more problems with his behavior.

As to Nicholson, it must be noted that in her contact with defendant's management, Hertenstein essentially portrayed him, up through September of 1997, as a victim like herself of rumors among the co-workers and the recipient of some harassing pages. The specific misconduct which Hertenstein now attributes to Nicholson are that he once tried to kiss her, that he twice placed his hand on her shoulder, told her he loved her and that "on a scale of 1–100 that his feelings for me were at 95% and that he wished for me to sleep with him at some point." There is again no evidence that Nicholson inappropriately touched her, threatened her, or used obscene or inappropriate language. Rather, the actual conduct of Nicholson (as alleged by Hertenstein) appears to constitute the sort of limited and sporadic incidents, not severe in nature, which are not held to be the basis for a hostile working environment.

Hertenstein attempts to compare her case to that presented in *Henderson v. Whirlpool Corp.* 17 F.Supp.2d 1238 (N.D.Okla.1998). *Henderson* has little resemblance to the present matter. The plaintiff in that case complained that a coworker touched her breasts, held her for several seconds about the ribs, assaulted her in a hallway, told offensive jokes to female co-workers (including a joke about lesbians told to the plaintiff), and after the plaintiff reported this behavior, stared at her in a potentially threatening manner. She further alleged that, following her complaint, other co-workers shunned her and spread rumors about her. Id. at 1243. Here, there is no allegation whatsoever that Estes or Nicholson assaulted Hertenstein; no allegation that they ever made inappropriate physical contact with her (the two "hugs" referred to by Hertenstein involved Nicholson placing his hand on her shoulder); no allegation that Estes or Nicholson told offensive jokes. The court finds that the alleged acts of Estes and Nicholson did not rise to the level of actionable sexual harassment.

■ Moreover, even assuming there was a basis for holding that Hertenstein was subjected to a hostile working environment by her co-workers, the court finds the claim of harassment must be dismissed since Hertenstein has failed to provide any basis for holding defendant Kimberly Health Care liable for the actions of her co-workers. There is no evidence whatsoever that Nicholson had any direct supervisory authority over Hertenstein, and no basis for imposing liability on defendant Kimberly Home Health Care for failing to remedy any alleged harassment by him. *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Burlington Industries v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).

Here, Hertenstein complained of conduct by Estes in June and September of 1997 and by Nicholson in November of the same year. After each complaint, managerial employees of the defendant spoke with the respective parties and provided counseling on the company's harassment policy. After Estes was first counseled in May, Hertenstein told the Branch Manager: "Everything is fine—he's been in and I've had no problems with him." After she complained in September when Estes allegedly made another inappropriate comment to her, Estes was counseled and, according to Hertenstein, "the sexual harassment stopped." No further incidents involving Estes ever occurred. After her complaint about Nicholson, the defendant's managers investigated, found that he denied the charges, and were unable to determine whose version of events was true. Nonetheless, a manager explicitly warned Nicholson about doing anything Hertenstein might construe as a sexual advance. Following this counseling and warning, Hertenstein has not identified any subsequent harassing conduct by Nicholson.

In the case of each complaint submitted by Hertenstein, the defendant's response appears to have been prompt, direct, and effective. No delay in the investigation of Hertenstein's complaints occurred. Estes was counseled and a written note placed in his employment file. Nicholson was also warned of the imposition of progressive discipline. Under these circumstances, the evidence supports the conclusion that the defendant undertook remedial action which was reasonably calculated to end the harassment. *See Adler v. Wal–Mart Stores,* 144 F.3d 664 (10th Cir.1998).

■ The plaintiff's claim of retaliation will also be dismissed. To support a claim for retaliation, the plaintiff must demonstrate that the defendant intentionally retaliated against her for engaging in protected activity. There is certainly evidence here that, following her complaint of Estes's behavior, Hertenstein's relations with some of her co-workers became strained. There is also evidence that some persons, possibly including co-workers of Hertenstein, made harassing pages or telephone calls to her. But there is no

evidence at all of any managerial involvement, orchestration of, or knowledge of and acquiescence in the alleged harassing conduct. Hertenstein has conceded that she does not know who sent the prank pages.

> An employer may not be held liable for retaliatory acts of co-workers if none of its supervisory or management-level personnel orchestrated, condoned, or encouraged the co-workers' actions, and no such management participation could occur if the supervisory or management-level personnel did not actually know of the co-workers' retaliation.

*Gunnell v. Utah Valley State College,* 152 F.3d 1253, 1265 (10th Cir.1998). Thus, in Anderson v. Coors Brewing, 181 F.3d 1171 (10th Cir.1999), the Tenth Circuit concluded that a defendant employer was not responsible in retaliation action for prank calls where plaintiff had no evidence they were placed by any of the defendant's managers or that the defendant condoned the calls: "While the calls were no doubt annoying, they do not amount to adverse employment action." *Id.* at 1178.

Here, Hertenstein has failed to do anything to show that the defendant's management condoned, encouraged or acquiesced in the alleged retaliatory acts by her co-workers. She does contend that intentional retaliation is shown by the alleged act of management in not maintaining the confidentiality of her complaints. However, there is no evidence any of the alleged ostracism was due to actions by management personnel revealing the existence of the complaint. Indeed, the evidence before the court establishes that Hertenstein played a substantial role in disseminating knowledge of the complaint. Hertenstein was explicitly told not to mention the complaint to co-workers. She has acknowledged that she did so, with Batiz and Gouldsmith, and was overheard doing so by a third, Timbrook.

■ The alleged retaliation by the defendant is therefore limited to the removal of her pager, receiving counseling on appropriate attire at work, and the posting of a policy prohibiting general access into the pharmacy area.

In the context of employment discrimination, the Tenth Circuit liberally defines the phrase "adverse employment action." *See Jeffries v. Kansas,* 147 F.3d 1220, 1232 (10th Cir.1998); *Gunnell v. Utah Valley State College,* 152 F.3d 1253, 1264 (10th Cir.1998). The court must take "a case-by-case approach" which focuses on the facts of each case. *Jeffries,* 147 F.3d at 1232. The Tenth Circuit recently summarized its decisions on this subject in *Trujillo v. New Mexico Dept. of Corrections,* 182 F.3d 933, 1999 WL 194151, at *3 (10th Cir.1999):

> For example, in *Corneveaux v. Cuna Mutual Insurance Group,* 76 F.3d 1498, 1502 (10th Cir.1996), we found adverse employment action based on the fact that the employee had to "go through several hoops" in order to obtain her severance benefits. In *Jeffries,* we held that verbal interrogation and reprimand, threats to withdraw supervision and not renew the employee's contract were sufficient to constitute adverse employment actions even though the actions did not actually have an adverse impact on the terms and conditions of the employee's employment. *See* 147 F.3d at 1232–33.

The Tenth Circuit recently held that an involuntary lateral transfer, without more, does not constitute an "adverse employment action" where the transfer merely increased the employee's commute and did not alter her salary, benefits, or elementary school teaching responsibilities, and the transfer was prompted by decreasing student enrollment. *See Sanchez v. Denver Pub. Schools,* 164 F.3d 527, 532 (10th Cir. 1998). The court wrote, " we will not consider 'a mere inconvenience or an alteration of job responsibilities' to be an adverse employment action." *Id. (citing Crady v. Liberty Nat'l Bank & Trust Co.,* 993 F.2d 132, 136 (7th Cir.1993); and *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 2268, 141

L.Ed.2d 633 (1998) (conduct is adverse employment action if it "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits")).

Here, the defendant has submitted evidence that the company's effort to reduce the number of pagers was made out of a desire to minimize costs by eliminating unnecessary pagers. And there seems little doubt that Hertenstein, whose pager was *never* used to call her to any translation assignment, was precisely the sort of employee whose possession of a pager was unwarranted. Equally, there is no evidence that the removal of her pager was any detriment at all to Hertenstein in the performance of her job duties.

As to the counseling on Hertenstein's dress, it is striking that the plaintiff herself does not contend in her response that her skirt/shorts were appropriate in length, but instead cites the testimony of her sister, Ms. Batiz, that her sister "looked fine." This does not controvert the defendant's evidence that Hertenstein's skirt/shorts appeared unprofessional within the meaning of the company's dress code. There is no indication, however, that Batiz has read or has any knowledge of the defendant's dress code. It is uncontroverted that other employees have been counseled for wearing inappropriate attire, including wearing too short a skirt. Batiz herself was counseled for appearing too informal shortly after she began work.

Similarly, the announcement that only authorized personnel should enter the pharmacy area was a policy adopted by the defendant, and required under state law, which was applied to all employees, and which has not been shown to have even the slightest impact on the job duties of Hertenstein. There is no evidence that the stated rationales for these acts—reducing the costs of unnecessary pagers and the uniform application of existing policies relating to pharmacy access and employee dress codes—was a pretext for unlawful retaliation. There is no evidence any of these events affected in any way plaintiff's employment position. The court finds that the plaintiff has failed to present evidence of action by the defendant which constitutes a significant change in her employment status so as to support a claim of actionable retaliation.

▇▇▇ Finally, the plaintiff has also advanced a claim of constructive discharge. A constructive discharge exists when working conditions become so intolerable that a reasonable person would feel forced to resign. *Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1367 (10th Cir.1997). At the time she left the defendant's employment in December of 1997, she had complained about harassment by Estes and Nicholson. By her own admission, the harassment had stopped. The prank pages and other harassment which was apparently related to rumors of an affair between her and Nicholson had also stopped. The court finds that a reasonable person would not have felt forced to resign because she received a single instance of counseling about unprofessional attire, because a pager which she never used was taken away, and because she was prohibited from access to an area where she was not supposed to be. The claim of constructive discharge will be dismissed.

IT IS ACCORDINGLY ORDERED this 12th day of July, 1999 that the defendant's motion for summary judgment is hereby granted.