Niville G. ANDERSON, Plaintiff,

v.

McALLISTER TOWING AND TRANS-PORTATION COMPANY, INC., and Arbabian Gulf Marine, Ltd., corporations, and the tug Offshore Sovereign, her engines, hull, tackle, and appurtenances thereof, Defendants.

No. CIV.A.97–0011–RV–S.

United States District Court,
S.D. Alabama,
Southern Division.

Aug. 21, 1998.

Ross Diamond, III, Mobile, AL, Donald Partridge, Mobile, AL, for Plaintiff.

Joseph M. Allen, Jr., Mobile, AL, John R. Parker, Mobile, AL, for Defendants.

## MEMORANDUM OPINION AND FINAL ORDER

VOLLMER, District Judge.

On January 6, 1997, plaintiff Neville G. Anderson ("Anderson"), a former employee of defendants McAllister Towing and Transportation Company, Inc. ("McAllister") and Arabian Gulf Marine, Ltd. ("AGM"), instituted this action to recover severance pay, unpaid wages, penalty wages, fringe benefits and other damages stemming from the termination of his employment. Although a number of plaintiff's claims were voluntarily abandoned, the core of the plaintiff's case proceeded to bench trial on December 18, 1997. This Memorandum Opinion and Final Order states the court's findings on the merits of the plaintiff's claims.

### I. BACKGROUND

#### A. Overview of Issues

As a consequence of his discharge from, and previous employment with, the defendants, plaintiff seeks the recovery of severance pay, the value of three round-trip airline tickets, and reimbursement for certain living expenses incurred after his termination, but before his discharge as Captain of the vessel Offshore Sovereign. In seeking such relief, plaintiff asserts claims under the maritime statutes of the United States and under the common law of contract. Plaintiff bases his relief on the terms of a contract entered into in February, 1988 in Saudi Arabia while plaintiff was working for defendants McAllister Towing and Transportation Company, Inc. and Arabian Gulf Marine.

## B. Subject Matter Jurisdiction

 The court finds that it has original subject matter jurisdiction over plaintiff's Seaman's Wage Act claim pursuant to 28 U.S.C. § 1333. Additionally, because the plaintiff and defendants McAllister and AGM are of diverse citizenship and the amount in controversy exceeds $50,000,[1] the court finds that it has original subject matter jurisdiction over plaintiff's contract based claims pursuant to 28 U.S.C. § 1332.[2]

## C. Personal Jurisdiction

 Defendants McAllister and AGM initially contested the court's exercise of personal jurisdiction. Both defendants, however, have abandoned their earlier challenge to personal jurisdiction. In the Joint Pretrial Document, the parties stated that they "admit jurisdiction of the court over the parties." (J. Pretrial Doc., Doc. 27 at 1). Consequently, the court finds that it has personal jurisdiction over defendants McAllister and AGM. With respect to the *in rem* defendant, the tug Offshore Sovereign, her engines, hull, tackle, and appurtenances thereof, the court, however, finds itself unable to exercise personal jurisdiction. The court reaches this finding because plaintiff has failed to serve the vessel in accordance with Rules C and E of the Supplemental Rules for Certain Admiralty and Maritime Claims, and because the *in rem* defendant has not voluntarily appeared in this action. *See Trinidad Foundry and Fabricating Ltd. v. M/V K.A.S. Camilla,* 966 F.2d 613, 615 (11th Cir.1992) ("Rule C(1)(a) is procedural and sets forth the means to file an in rem action to enforce a maritime lien. The requirements of Rule C are to be read literally, and a vessel is not considered to be within the court's in rem jurisdiction when the rule has not been complied with, absent an agreement between the parties to the contrary." (citations and footnotes omitted)); *see also J.O. Alvarez, Inc. v. Rainbow Textiles, Inc.,* 168 F.R.D. 201, 203 (S.D.Tex.1996) ("Valid service of process is required before a court can assert personal jurisdiction over a defendant. Therefore, a district court cannot exercise jurisdiction over a defendant which has not been served properly." (citation omitted)). Consequently, the court finds that the *in rem* defendant

---

1. Because this action was instituted prior to January 17, 1997, the amount in controversy needs only to exceed $50,000.00. *See Amundson & Assoc. Art Studio, Ltd. v. National Council of Comp. Ins., Inc.,* 977 F.Supp. 1116, 1121 n. 5 (D.Kan.1997) (noting that the amendment which increased the amount in controversy requirement from $50,000.00 to $75,000.00 "became effective January 17, 1997, and is not retroactive").

2. Although plaintiff first asserted his theory of jurisdiction based on diversity of citizenship in his "Brief in Opposition to Motion to Dismiss" (Doc. 11), factual allegations sufficient to satisfy diversity jurisdiction were set forth in plaintiff's Complaint (Doc. 1) and Amended Complaint (Doc. 5). While plaintiff has not sought leave of court to amend his pleadings to add an explicit claim of diversity jurisdiction, he has included such a claim in the Joint Pretrial Document (Doc. 27), which was incorporated as a binding portion of the court's Pretrial Order (Doc. 31). *See* Doc. 31 at ¶ (C)(1); *cf. Expertise, Inc. v. Aetna Finance Co.,* 810 F.2d 968, 973 (10th Cir.1987) ("When an issue is set forth in a pretrial order, it is not necessary to amend previously filed pleadings.").

Although defendants appear to challenge the plaintiff's assertion of diversity of citizenship jurisdiction by attacking it on the merits in the Joint Pretrial Document, they have not asserted a failure to plead argument at any time. As the parties are aware, the pre-trial document (which is part and parcel of the court's Pretrial Order) controls what facts and legal issues remain in the litigation. *See* Fed.R.Civ.P. 16(e); *see also Mitchell v. Coffey County Hosp.,* 903 F.Supp. 1415, 1421 (D.Kan.1995) ("The pretrial order supersedes the pleadings and controls the subsequent course of litigation."). If a claim or defense is not raised therein, it is lost. *See Jackson v. Seaboard Coast Line R.R. Co.,* 678 F.2d 992, 1012 (11th Cir.1982) ("The failure to include an affirmative defense in the answer or have it included in the pre-trial order of the district court, which supersedes the pleadings, will normally result in waiver of the defense."); *see also Funding Sys. Leasing Corp. v. Pugh,* 530 F.2d 91, 96 (5th Cir.1976) ("When the defendant has waived his affirmative defense by failing to allege it in his answer, or have it included in a pre-trial order of the district court that supersedes the pleadings, he cannot revive the defense in a memorandum in support of a motion for summary judgment."). Consequently, the court finds that the defendants have waived any objection to the plaintiff's failure to follow procedures in not properly seeking leave to amend. With respect to the defendants' substantive challenge to the existence of diversity jurisdiction, the court finds for the plaintiff. The citizenship of the parties and the amount in controversy clearly support the existence of federal diversity jurisdiction.

is due to be, and hereby is, DISMISSED, without prejudice, from this action.

## D. Venue

Venue is appropriate in this district pursuant to 28 U.S.C. § 1391.

## E. Procedural History

Plaintiff filed the initial Complaint in this action on January 6, 1997. (Doc. 1). Prior to the filing of any responsive pleadings, plaintiff amended his Complaint pursuant to Federal Rule of Civil Procedure 15(a) on January 24, 1997. Defendants McAllister and AGM responded to the plaintiff's initial pleadings by filing an Answer on March 7, 1997.

On March 25, 1997, McAllister and AGM moved to dismiss this action alleging lack of subject matter jurisdiction. (Doc. 8). In response to the defendants' motion, plaintiff asserted that federal subject matter jurisdiction over his claims was proper under both the federal diversity jurisdiction statute, 28 U.S.C. § 1332, and the federal maritime jurisdiction provision, 28 U.S.C. § 1333. After review, the court denied the defendants' motion and found that it had subject matter jurisdiction.

On July 17, 1997, plaintiff filed a motion for summary judgment. The matter was fully briefed by the parties and plaintiff's motion was supported by various evidentiary materials. Before the court was able to conclude its ruling on the motion for summary judgment, this matter proceeded to the scheduled final pretrial conference. In accordance with the court's procedures, the parties filed their "Joint Pretrial Document" (Doc. 27) two business days prior to the date of the pretrial conference. On Tuesday, October 7, 1997, the court conducted the final pretrial conference on the record in chambers. (See Final Pretrial Doc., Doc. 31). At the conference, the court inquired into matters of choice of law, settlement, and the pending motion for summary judgment. On the record during the conference, plaintiff voluntarily abandoned a claim for penalty wages. (Pretrial Conf. Tr. at 4). Additionally, plaintiff voluntarily withdrew a claim for unpaid wages in a submission filed on the day of the pretrial conference. (Doc. 30).

After the pretrial conference, the court reviewed plaintiff's motion for summary judgment and found that questions of material fact existed in the file. Consequently, the court denied plaintiff's motion on November 21, 1997. The case then proceeded to a bench trial, which was held on December 18, 1997.

At the bench trial in this matter, plaintiff submitted his case to the court on documentary evidence and deposition testimony. Defendants elected to present no evidence. Each of the parties presented oral argument and, as well, trial briefs for the court's consideration. (Docs. 39 & 42).

On July 15, 1998, the court issued an Order (Doc. 43) which stated:

> After reviewing the parties' trial briefs and the materials submitted to the court at the December 18, 1997 bench trial of this matter, the court notes that neither party has properly addressed the question of which law governs the construction, interpretation and validity of the contract at issue. Consequently, the court is inclined to apply Alabama law to the contract law issues in this case. *Cf. Wood v. Mid–Valley Inc.*, 942 F.2d 425, 426–27 (7th Cir.1991) ("The operative rule is that when neither party raises a conflict of law issue ..., the federal court simply applies the law of the state in which the federal court sits.... With the principal exception of issues going to the subject-matter jurisdiction of the federal courts, these courts are not required to and ordinarily do not create issues[.]"). To inform the court's decision on this matter, the parties are hereby **ORDERED** to indicate their respective positions on the aforementioned choice of law issue **by no later than Wednesday, July 29, 1998.** If either party contests the application of Alabama contract law, that party shall file a brief which specifically references the choice of law authority on which the party relies, and, as well, cites to the foreign case law or statute which purportedly governs the contract law issues in this case.

(Order of July 15, 1997, Doc. 43). The parties filed their submissions in response to the court's Order in a timely fashion. In his response brief, plaintiff asserted that the

court should apply Alabama law. By contrast, the defendants asserted that Saudi Arabian law should apply to the contract law issues in this case. In direct contravention of the court's Order and Federal Rule of Civil Procedure 44.1, however, defendants failed to provide the court with *any* citation of Saudi Arabian contract law.[3]

## II. FINDINGS OF FACT

1. Plaintiff Neville G. Anderson is a British citizen and a resident of Thailand.

2. Defendant McAllister Towing and Transportation Company, Inc. ("McAllister") is a Delaware corporation[4] with its principal place of business in New York.

3. Defendant Arabian Gulf Marine Ltd. ("AGM") is a wholly-owned, foreign subsidiary of McAllister.

4. From February, 1988 until the end of December, 1996, plaintiff was continuously employed under an employment contract with defendants McAllister and AGM, during which plaintiff provided services for McAllister, AGM and other McAllister subsidiaries.[5]

5. Plaintiff's employment contract with McAllister and AGM provided for the payment of severance pay at the rate of "one and a half months salary for every one completed year of service for the Company or part thereof." (Def.'s Ex. 7 at ¶ 8).

6. Plaintiff's employment contract with McAllister and AGM provided for the following work and leave schedule: "90 days on location followed by 30 days paid leave, with one Business Class Return Ticket to each persons [sic] country of [r]esidence. If due to location and work load the leave cannot be taken, the Company will pay to the employee the cost of the air ticket and the additional 30 days salary at the end of each 90 days." (*Id.* at ¶ 3).

7. In February, 1988, Anthony Bucknole had valid actual authority to enter into

---

3. *See infra* note 6 and accompanying text.

4. Plaintiff has alleged, and defendant McAllister has admitted, that "[t]he defendant, McAllister Towing & Transportation Co., Inc., is a corporation organized under the laws of one of the United States, having its principal place of business in the State of New York." (Joint Pretrial Doc., Doc. 27 at 2). Although inconsequential to the jurisdictional issues in this .case, the court finds it appropriate to take judicial notice of the fact that defendant McAllister is incorporated under the laws of the state of Delaware.

5. At all times during plaintiff's work relationship with McAllister, AGM, and other McAllister subsidiaries—and, as well in the employment contract at issue—it remained unclear exactly who was the plaintiff's employer. This lack of clarity is not surprising given plaintiff's constant assignment and reassignment among the various branches of the McAllister family of companies. Indeed, during his deposition, plaintiff stated: "I didn't know who was really running the company, you know. No one had told me that." (Pl.'s Dep. at 91). Additionally, it appears that the management employees within McAllister and AGM were unclear as to which employees worked for which entity. Indeed, the plaintiff indicated that while he was running the Offshore Sovereign, a vessel owned by McAllister, he took his instructions from Anthony Bucknole, who worked for Offshore Shipbuilding, and had previously run Saudi Tug Services and AGM. Plaintiff's relationship with Bucknole and Offshore Shipbuilding abruptly ended when he was summarily informed that his operation was going to

be run by McAllister out of New York. (Pl.'s Dep. at 77–78, 85). By contrast, during most of the preceding period, plaintiff had been told that he was working for AGM.

The only persuasive indication of plaintiff's employment provided to the court is plaintiff's February, 1988 employment contract with McAllister and AGM. At all times between February, 1988 and plaintiff's termination on December 31, 1996, plaintiff worked under the same contract with McAllister and AGM, with no termination, amendment or replacement of that contract. Without overanalyzing the defendants' motives for maintaining a jumbled organizational structure, the court finds that the defendants employed the plaintiff in such a flexible role within the companies for the convenience of McAllister and AGM. Consequently, the court finds that plaintiff was a contract employee shared by both McAllister and AGM.

With respect to the defendants' assertion that the plaintiff has failed to demonstrate valid claims against *"these* defendants," (Defs' Trial Br., Doc. 39 at 1), the court finds no merit. Defendants cannot construct an incomprehensible web of employment relationships with their employees only to claim in later litigation that their employees cannot provide adequate proof of employment. Equity will not allow such conduct to prevail. Such is especially the case where, as here, the employee has been provided with an employment contract from two commonly-owned employers each of which separately benefitted from the employee's services.

an employment contract with the plaintiff on behalf of defendants McAllister and AGM.

8. Anthony Bucknole held a valid general power of attorney from defendant McAllister at the time the contract at issue was signed.

9. Anthony Bucknole served as the general manager of defendant McAllister's Middle East operations at the time the contract was signed.

10. Anthony Bucknole served as the manager in charge of defendant AGM at the time the contract was signed.

11. From September, 1995 until the end of December, 1996, plaintiff served as the Captain of the vessel Offshore Sovereign, transporting a barge on voyages from Mobile, Alabama and two other ports in the United States to ports in the Dominican Republic, Haiti, and Jamaica.

12. The Offshore Sovereign was, at all relevant times, a foreign vessel operating under Liberian flag.

13. While serving as the captain of the Offshore Sovereign, plaintiff received a salary of $3,750.00 per month.

14. Plaintiff's employment contract was terminated by defendants McAllister and AGM on December 31, 1996, while plaintiff and the Offshore Sovereign were in port in Mobile, Alabama.

15. At the time of his termination, plaintiff had served for nearly nine years under the February, 1988 employment contract with defendants McAllister and AGM.

16. During his service as the Captain of the Offshore Sovereign, plaintiff earned the right to three round-trip airline tickets which were never paid to him by the defendants.

## III. DISCUSSION

■■■■ As a preliminary matter, the court notes that neither party has properly asserted a choice of law issue in this case.[6] Conse-

---

6. Early in the proceedings in this case, the court noted that a choice of law issue might be presented insofar as the place of contracting was in a foreign country, namely Saudi Arabia. Because neither party had asserted a choice of law question, the court felt it necessary to note at the pretrial conference that Saudi Arabian law might apply and, at that time, to give the parties an opportunity to address the issue. In response to the court's query, plaintiff's counsel indicated that he believed United States' law should apply. (Pretrial Conf. Tr. at 2). Presumably, plaintiff's counsel meant Alabama law insofar as the notion of a federal common law has been frowned upon by the courts. See Alexander Proudfoot Co. World Headquarters v. Thayer, 877 F.2d 912, 917–18 (11th Cir.1989) (noting under the Erie doctrine that "if the application of federal judge-made law would encourage forum shopping and promote the inequitable administration of the laws, then the court must apply state law"); see also William M. Richman & William L. Reynolds, Understanding Conflicts of Laws 292–294 (2nd Ed.1993) (discussing the Erie court's rejection of the earlier notion of a federal general common law on substantive law questions not otherwise governed by statute). Defendants' counsel, by contrast, asserted in a muddled response to the court's query that "the law of the country" should apply—an assertion which reveals little more than confusion and ambiguity. (Pretrial Conf. Tr. at 2).

After the pretrial conference in this matter, the parties proceeded in their trial briefs and arguments without raising choice of law issues, and

without citing to foreign law. Indeed, at no time prior to or during the bench trial in this case did either party cite to any case or statute involving Saudi Arabian law. Although defendants' counsel has now decided—more than seven months after trial—to assert a choice of law argument urging the application of Saudi Arabian law, the argument comes too late to influence the court's decision. Defendants have dragged their feet on this matter for too long, only seeing fit to assert the applicability of Saudi Arabian law after the court prodded the parties for a second time with the concept of choice of law. (See Doc. 43). Such late notice falls far short of the requirements set forth in the Federal Rules of Civil Procedure, especially in a situation such as this where the defendants have been on notice of the possible applicability of Saudi Arabian law since the earliest days of this lawsuit. Cf. 9 James Wm. Moore et al., Moore's Federal Practice § 44.1.03[3] (3rd Ed.1998) ("Hand-in-hand with the method of proving notice of foreign law is the timing of that notice.").

Federal Rule of Civil Procedure 44.1 clearly provides that "[a] party who intends to raise an issue concerning the law of a foreign country shall give notice by pleadings or other reasonable notice." The reasonableness of the notice is to be determined by reference to "[t]he stage which the case had reached at the time of the notice, the reason proffered by the party for his failure to give earlier notice, and the importance to the case as a whole of the issue of foreign law sought to be raised[.]" Fed.R.Civ.P. 44.1 advisory committee's note. After review, the court finds that

quently, the court shall apply the maritime statutes of the United States of America to plaintiff's statutory claim for wages, and Alabama law to questions regarding the construction, interpretation and validity of plaintiff's employment contract with McAllister and AGM. *See Wood v. Mid–Valley, Inc.,* 942 F.2d 425, 426–27 (7th Cir.1991) ("The operative rule is that when neither party raises a conflict of law issue . . . , the federal court simply applies the law of the state in which the federal court sits.").

### A. *Plaintiff's Claim for Wages Under the Seaman's Wage Act*

Prior to addressing the merits of plaintiff's wage claim, the court notes that plaintiff has abandoned his claims for penalty wages [7] and for wages due and owing for the thirty days following his termination.[8] Additionally, due to the plaintiff's failure to serve the *in rem* defendant, plaintiff is unable to maintain a claim for a maritime lien against the vessel Offshore Sovereign. *See J.O. Alvarez, Inc.,* 168 F.R.D. at 203 ("Valid service of process is required before a court can assert personal jurisdiction over a defendant. Therefore, a district court cannot exercise jurisdiction over a defendant which has not been served properly." (citation omitted)). Consequently, plaintiff's maritime wage claim is limited to

an in personam claim against defendants McAllister and AGM as his employers.

■ Plaintiff asserts his maritime law wage claim against the defendants under both 46 U.S.C. § 10313 and 46 U.S.C. § 10504. Defendants challenge the plaintiff's statutory claims by asserting that neither statutory provision applies to individuals, such as the plaintiff, who served as the master of a vessel. After review, the court finds the defendants' challenge to be correct.

Sections 10313 and 10504 provide remedies for seamen to recover wages and penalty wages. These sections, however, do not include masters of vessels in their remedy provisions, despite the separate mention of masters throughout the Seaman's Wage Act, 46 U.S.C. §§ 10101–11501, as recodified in 1983. The court finds that this omission is not accidental, insofar as masters have traditionally been excluded from the special statutory protections afforded wage claims by common seamen. As stated by the Supreme Court in reference to a previous version of the Seaman's Wage Act:

> [M]aritime law by inveterate tradition has made the ordinary seaman a member of a favored class. He is a 'ward of the admiralty,' often ignorant and helpless, and so

the defendants have failed to produce reasonable notice of their intent to raise an issue of foreign law.

In the present case, defendants have waited nearly one and one half (1.5) years after filing their Answer to assert that Saudi Arabian law should apply. Additionally, as mentioned above, this notice also comes more than seven months after this matter was tried to the court. Defendants have provided the court with no reason—good or bad—for why they have waited until this late date to assert the application of Saudi Arabian law. Additionally, defendants have asserted Saudi Arabian law without providing the court with any meaningful citation to Saudi Arabian case law or statute. Consequently, the court is unable to gauge whether the relevant Saudi Arabian law conflicts with, is consonant with, or is repugnant to, Alabama law. It is not the court's job to perform the research for the parties. Rule 44.1 does not "impos[e] an obligation on the court to take 'judicial notice' of foreign law because this would put an extreme burden on the court in many cases." Fed.R.Civ.P. 44.1 advisory committee's note. Such a burden would certainly be presented in this case. *See Grice v. A/S J. Ludwig Mowinckels,* 477 F.Supp. 365, 367 (S.D.Ala.1979) ("Experience teaches that deter-

mining the law of many foreign countries—and Saudi Arabia is probably a paradigmatic example—is considerably more complex than going to the ... law library. The search may lead to university libraries, embassies, metropolitan practitioners, and often to members of the bar of the foreign nation itself."). Consequently, the court finds the defendants' notice of foreign law to be untimely and inadequate. Insofar as the choice of law issue was waived by the parties, the court shall apply forum (Alabama) law to the contract law issues in this case. *See, e.g., Vukadinovich v. McCarthy,* 59 F.3d 58, 62 (7th Cir. 1995) ("choice of law, not being jurisdictional, is normally, ..., and we think here, waivable"); *Wood v. Mid–Valley Inc.,* 942 F.2d 425, 427 (7th Cir.1991) (applying forum law where conflict of law issue was not raised).

7. Plaintiff voluntarily withdrew his penalty wage claim at the court's October 7, 1997 pretrial conference. (Pretrial Conf. Tr. at 4).

8. Plaintiff abandoned his wage claim for January, 1997 in his "Notification of Filing of Corrected Findings of Fact and Conclusions of Law." (Doc. 30).

in need of protection against himself as well as others. The master, on the other hand, is able in most instances to drive a bargain for himself, and then when the bargain is made, to stand upon his rights. Discrimination may thus be rational in respect of remedies for wages.

*Warner v. Goltra*, 293 U.S. 155, 162, 55 S.Ct. 46, 79 L.Ed. 254 (1934). This difference in treatment has been continued in the federal maritime wage statute in the long-standing separate statutory definitions provided for the terms "master" and "seaman." *See* 46 U.S.C. § 10101(1) & (3) (setting forth the separate definitions); *cf. Blackton v. Gordon*, 303 U.S. 91, 93–94, 58 S.Ct. 417, 82 L.Ed. 683 (1938) (noting that masters and seamen were to be afforded different treatment under the wage statute where Congress had maintained the same distinction in the statutory definitions despite numerous other amendments). Although Congress has amended the Seaman's Wage Act since the Court's decisions in *Warner* and *Blackton,* the distinction between master and seamen has been maintained. Consequently, as one court has stated:

> The [s]tatute's words must be given their plain meaning and precedent and Congress' intent must be deferred to. Although the trend in other areas of maritime law may be to favor inclusion of the master in remedies afforded to seamen, as certainly it should, 46 U.S.C. § 10313 still provides a remedy only to seamen, and not to the master [ ] of a vessel. It is up to Congress, rather than the courts, to change the language of the provision.

*George v. Kramo Ltd.,* 796 F.Supp. 1541, 1548 (E.D.La.1992); *see also Rothmann v. S/S President Taft,* No. C 94–2935 FMS,

1995 WL 458979 (N.D.Cal. Nov. 14, 1994) (concluding that "section 10313 provides a remedy for earned wages and penalty wages only to seamen, and not to masters"). The court finds that this logic applies with equal force to masters' claims for wages under 46 U.S.C. § 10504.[9]

Based on the foregoing, the court finds, as a matter of law, that the plaintiff is unable to prevail on his maritime law wage claims under 46 U.S.C. § 10313 and 46 U.S.C. § 10504. This finding, however, does not preclude all avenues of recovery for the plaintiff. Plaintiff has also asserted a claim for a contract-based recovery, thereby invoking the diversity jurisdiction of this court.

## B. *Plaintiff's Contract–Based Claims*

Plaintiff and the defendants entered into their employment contract in February, 1988. The contract was terminated by the defendants on December 31, 1996. Plaintiff contends that, under the employment contract, he is entitled to severance pay, the value of three airline tickets, and reimbursement for certain living expenses incurred after his termination; but before his discharge as Captain of the vessel.

Defendants oppose the enforcement of the contract by asserting that Anthony Bucknole, the drafter and signer of the document, allegedly lacked valid authority to enter into the contract on their behalf. In the alternative, defendants assert that if the contract is found to be valid, the plaintiff's claimed damages are inflated because the geographical scope of the contract is "ambiguous" and should be limited to operations in Saudi Arabia.[10]

9. With respect to the plaintiff's attempt to salvage his maritime claims by referring to 46 U.S.C. § 11112, the court is unpersuaded. Section 11112 refers to the priority of a master's claim for a maritime lien for wages. No such claim is presented in this case insofar as the plaintiff has failed to serve the vessel, and former *in rem* defendant, the Offshore Sovereign. *Cf.* Alex L. Parks & Edward V. Cattell, Jr., *The Law of Tug, Tow and Pilotage* 846 (3d Ed.1994) ("True maritime liens can only be enforced by an *in rem* proceeding in admiralty."). Furthermore, plaintiff's reference to 46 U.S.C. § 10317 also fails to generate or preserve a statutory claim for wages. Section 10317 prohibits contractual agreements

which limit masters and seamen from asserting maritime lien claims or other remedies to which they might be entitled for the recovery of wages. Defendants have not asserted a contract agreement or waiver to defeat plaintiff's claims. Thus, section 10317 is inapplicable to this case.

10. Defendants issue no other challenges to plaintiff's contract claim. The court notes at this stage that the plaintiff has proved by a preponderance of the evidence that the contract at issue was supported by valid mutual consideration in the form of defendants' contractual assurances and plaintiff's continued services.

### 1. Should the Contract's Applicability be Limited Due to Ambiguity?

 Addressing the defendants' challenges to the plaintiff's contract claim in reverse order, the court notes that the defendants are somewhat constrained in their assertion of ambiguity to limit their own contract under the rule of contra proferentem. *See Black's Law Dictionary* 327 (6th Ed.1990) ("Used in connection with the construction of written documents to the effect that an ambiguous provision is construed most strongly against the person who selected the language."). Under that rule, the drafter of a contract cannot later attack its own document as being ambiguous without facing the possibility that the disputed terms will be construed in favor of the nondrafting party. *See Molton, Allen and Williams, Inc. v. St. Paul Fire and Marine Ins. Co.*, 347 So.2d 95, 99 (Ala. 1977) (noting that ambiguities in a contract are to be construed against the drafter except in those situations where circumstances make the terms clear).

In addition to being limited in their arguments by the general rule of contra proferentem, the defendants' contention is also clearly incorrect. The scope of the contract is expressed in clear and unambiguous terms under paragraph 11: "This Contract is binding while employed by McAllister Towing & Transport at any location worldwide, except in the following circumstances, e.g. based in their own country." No geographic limitations are placed on the contract except for when employees are "based in their own country." In the present case, plaintiff was not at any time based out of his country of residence, Thailand, or his country of citizenship, the United Kingdom.

 Additionally, while the contract mentions under its severance pay provision that "severance pay will be provided as per the local law of the country, which is one and a half months salary for every one completed year of service for the Company or part thereof," this statement merely indicates the defendant's intent to utilize the custom of the place of contracting, namely Saudi Arabia, in defining the amount of severance benefits provided under the contract. The defendant contends that this provision calls into question the scope of the contract's coverage.

This contention is incorrect. The contract clearly sets forth its scope of coverage under paragraph 11. These two provisions are not in conflict, but rather provide that McAllister and AGM employees covered by the contract are entitled to severance pay as set forth under the law of the place of contracting (i.e. Saudi Arabia) whether those employees are discharged in that country or "at any other location worldwide." Parties to a contract "are entitled to have their ... contracts enforced as written, rather than risking their terms either to judicial interpretation or the use of straining language, and the fact that different parties contend for different constructions does not mean that the disputed language is ambiguous." *Gregory v. Western World Ins. Co.*, 481 So.2d 878, 881 (Ala.1985) (citation omitted). As these provisions are not in conflict, and as such are not ambiguous, no further analysis is necessary.

### 2. Did Anthony Bucknole Have Valid Authority to Bind the Defendants?

Defendant McAllister attacks Anthony Bucknole's authority to enter into an agreement binding on its behalf insofar as the McAllister challenges the scope of Bucknole's power of attorney. By contrast, defendant AGM has not set forth any specific objection or evidence to oppose Bucknole's authority.

 McAllister asserts that the power of attorney issued to Bucknole on February 2, 1988 conveyed nothing more than the limited authority "to enter agreements on behalf of Saudi Tug Services." (Defs' Trial Br., Doc. 39 at 6). After reviewing the power of attorney, however, the court finds that the authority conveyed was much broader. In making this finding, the court notes that the power of attorney is captioned as a "General Power of Attorney." (Pl.'s Ex. 14 at 1). The general authority conveyed to Bucknole on behalf of McAllister is further expressed in the last two paragraphs of the document.

 Paragraph nine of the power of attorney states: "Any act, deed, instrument of said Attorney-in-Fact shall, as between McAllister and any person dealing with said Attorney-in-Fact, be valid and binding on the Company." (Pl.'s Ex. 14 at ¶ 9). Although this provision appears to be intended to ex-

tend liability for agreements between McAllister and third persons to Saudi Tug Services, referred to as "the Company," the provision clearly contemplates the execution of agreements between McAllister and third persons by Bucknole. Any remaining confusion regarding Bucknole's authority to bind McAllister is made clear in the closing paragraph of the power of attorney:

McAllister hereby ratifies and confirms and agrees to ratify and confirm whatsoever shall be lawfully done by said Attorney-in-Fact or any substitute or substitutes as aforesaid under or by virtue of these presents.

(Pl.'s Ex. 14 at 3). The court finds that, even under the strictest of constructions, the power of attorney at issue conveyed actual authority on Anthony Bucknole to enter into the employment contract at issue so as to bind defendant McAllister. *Cf. Sevigny v. New S. Fed. Sav. & Loan Ass'n*, 586 So.2d 884, 886–87 (Ala.1991) (noting that powers of attorney should be strictly construed, and defining the power of attorney as "[a]n instrument authorizing another to act as one's agent. . . ." The agent is attorney in fact.) (quoting *Black's Law Dictionary* 1171 (6th Ed.1990)). Furthermore, the court notes that, at the time of contracting, Bucknole served as the general manager of McAllister's operations in the Middle East.[11] In such capacity, Bucknole acted as the alter ego of McAllister, with full authority to enter into contracts on the company's behalf. *See Buchanan Contracting Co. v. Denson*, 262 Ala. 592, 80 So.2d 614, 615 (1955) (noting, with respect to the general manager of a

geographical branch of operations, that "he maintained the status as the alter ego of the corporation in that particular area and his act or acts were the acts of the corporation. And his authority would be coextensive with the management of that branch of the operations.").

▮ Additionally, after review, the court finds that plaintiff has also proved by a preponderance of the evidence that Bucknole had valid authority to enter into contracts on behalf of defendant AGM. The uncontroverted evidence in this case demonstrates that Anthony Bucknole was the manager in charge of defendant AGM at the time of contracting. In that role, Bucknole functioned as the alter ego of AGM and had valid authority to administer contracts on behalf of the company. *See Buchanan*, 80 So.2d at 615; *see also Belcher v. Birmingham Trust Nat'l Bank*, 348 F.Supp. 61, 122 (N.D.Ala.) ("Unless the authority of a general manager is restricted, his authority and powers 'are coextensive with the powers of the corporation itself, and he has authority to do any act on its behalf . . . in the ordinary course of the company's business . . .)'" (quoting *Sheip v. Baer*, 210 Ala. 231, 97 So. 698, 700 (1923)), *stay of jdgmt denied* 395 F.2d 685 (5th Cir. 1968); *W.T. Rawleigh Co. v. Phillips*, 232 Ala. 124, 167 So. 271, 272 (1936) ("A general manager has broad powers and implied authority to control the affairs of the company.").

Based on the foregoing, the court finds that plaintiff has established by a preponderance of the evidence that there was valid

---

**11.** In his disposition, Anthony Bucknole described his authority as derived from his role as McAllister's general manager in the Middle East and under the power of attorney from McAllister:

Q: What were your duties with McAllister as the general manager of Mid East operations?
A: I was McAllister['s] . . . person there. I was acting for McAllister. . . .
Q: What was the purpose of the power of attorney . . .?
A: It was just, I was there as McAllister. I had full authority to do whatever McAllister needed to do there.
Q: Acting in that capacity, did you have authority to hire employees for the company?
A: Yes.
Q: Did you have authority to enter into any contracts?

A: Yes.
Q: What types of contracts did you enter into on behalf of McAllister or any of its subsidiaries?
A: Employment contracts for vessels, contract for food for the vessels, contracts for ship repairs, contracts for crews, contracts for shore personnel and sea personnel.
Q: Did you ever sell any vessels on behalf of McAllister or any of its subsidiaries?
A: Yes.
Q: Did you execute documents in connection with the sale of those vessels?
A: Yes.
(Bucknole Dep. at 14–15).

assent to the employment contract by both defendants, each acting through their common agent, Anthony Bucknole. Consequently, plaintiff has satisfied his burden of proving mutual assent to the contract.

### 3. *Recoverable Damages Under the Contract*

Plaintiff contends that, under the employment contract, he is entitled to severance pay, the value of· three airline tickets, and reimbursement for certain living expenses incurred after his termination, but before his discharge as Captain of the vessel. After review, the court finds the contract and the evidence in this case do provide for· the recovery of severance pay and the value of three airline tickets. With respect to plaintiff's claim for post-termination living expenses, the court finds that the contractual language and the timing of the plaintiff's discharge do not support any such recovery.

Under the paragraph eight (8) of the contract, plaintiff is entitled to one and one half (1.5) months of severance pay for each complete year of employment with the defendants, including any portion of a year left unfinished, accruing from the time the contract was entered into in February, 1988 until his termination on December 31, 1996. Consequently, plaintiff is due to recover thirteen and one half (13.5) months of severance pay at his final salary for the nearly nine years of service he performed under the contract. Thus, plaintiff shall have and recover **FIFTY THOUSAND SIX HUNDRED TWENTY FIVE DOLLARS AND ZERO CENTS ($50625.00)** in severance pay from the defendants.

Pursuant to paragraph three (3) of the employment contract, plaintiff is entitled to the money value of three round-trip business class airline tickets between Mobile, Alabama and his primary place of residence in Bangkok, Thailand. Plaintiff earned these tickets under the contract while serving as the master on the Offshore Sovereign, yet the defendants never compensated the plaintiff with the tickets. Consequently, plaintiff is due to recover from the defendants the monetary value of these tickets, which is **ELEVEN THOUSAND EIGHT HUNDRED EIGHTY EIGHT DOLLARS AND SIXTEEN CENTS ($11,888.16).**[12]

### IV. *CONCLUSION*

Based on the foregoing, the court finds that plaintiff has proved by a preponderance of the evidence that he is entitled to recover severance pay and the value of three round-trip airline tickets under his employment contract with defendants McAllister and AGM. Thus, plaintiff is entitled to recover from defendants McAllister and AGM severance pay under the contract in the amount of **FIFTY THOUSAND SIX HUNDRED TWENTY FIVE DOLLARS AND ZERO CENTS ($50625.00)**. Furthermore, the court finds that plaintiff is entitled to recover from defendants McAllister and AGM the monetary value of three (3) round-trip airline tickets from Mobile, Alabama to Bangkok, Thailand, which is **ELEVEN THOUSAND EIGHT HUNDRED EIGHTY EIGHT DOLLARS AND SIXTEEN CENTS ($11,-888.16)**. Consequently, the court finds that the plaintiff, Neville G. Anderson·shall have and recover **SIXTY TWO THOUSAND FIVE HUNDRED THIRTEEN DOLLARS AND SIXTEEN CENTS ($62,513.16)** jointly and severally from defendants McAllister and AGM.

The court further finds that plaintiff's claims against the *in rem* defendant, the tug Offshore Sovereign, her engines, hull, tackle, and appurtenances thereof, are due to be, and hereby are, **DISMISSED, without prejudice,** from this action due to failure of service and a consequent lack of personal jurisdiction.

---

12. The court bases its calculation of plaintiff's airline fare recovery on the ticket values presented at trial in the form of an affidavit. (Pl.'s Ex. 13). In that affidavit, Ms. Barbara Brunson, a travel agent with Executive Travel, Inc. in Mobile, Alabama, referenced a printed itinerary of round-trip between Mobile, Alabama and Bangkok Thailand. That itinerary bore the price of three thousand nine hundred sixty two dollars and seventy two cents ($3,962.72). The court finds the value stated in the printed itinerary to be the most credible evidence of ticket price presented in this case.

The court's findings shall be memorialized in a final judgment to be entered contemporaneously with this Order.